COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
Email: marco@coastlawgroup.com

SAN DIEGO COASTKEEPER
PATRICK MCDONOUGH (SBN 288285)
COURTNEY BROWN (SBN 360257)
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (619) 609-0860
Email: patrick@sdcoastkeeper.org

Attorneys for Plaintiffs COASTAL ENVIRONMENTAL RIGHTS FOUNDATION and SAN DIEGO COASTKEEPER

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> CONMEX INC.; a California Corporation, <br><br> Defendant. | Civil Case No. **'26 CV 3823 RSH MMP** <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.)** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.    JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.    On September 8, 2025, Plaintiffs issued a 60-day notice letter ("Notice Letter") to CONMEX INC ("Defendant" or "ConMex") as the owner and/or operator of the Facility located at 1012 Grand Avenue, Spring Valley, California 91977 ("Facility"), regarding its violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 2014-0057-DWQ as amended by Order 2015-0122-DWQ & Order 2018-0028-DWQ (effective July 1, 2020) ("Permit," "IGP," or " Industrial General Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.    Plaintiffs mailed the Notice Letter to the Facility's physical address, 1012 Grand Avenue, Spring Valley, California 91977, and to Defendant's Agent for Service of Process at the same address via certified mail.

4.    Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

5.    More than sixty (60) days have passed since the Notice Letter was served on

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    1

Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6. Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.   <u>INTRODUCTION</u>

7. Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

8. Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters and groundwater including Spring Valley Creek, the Sweetwater Reservoir, the Lower Sweetwater River, the San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

9. Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge, and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

10. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11. Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of birds and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12. This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    2

and compromises or destroys their Beneficial Uses.

13. Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14. The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members' use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation. Coastkeeper, CERF, and their members also use and enjoy the Receiving Waters for educational opportunities, developing educational tools, habitat monitoring, restoration activities, and other scientific studies, which are also negatively impacted by the Defendant's IGP and Clean Water Act violations as described herein.

## III. PARTIES

15. CONMEX INC is an active California Corporation and is the Owner and/or Operator of the Facility.

16. Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    3

17.    CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

18.    Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

19.    Plaintiffs and Plaintiffs' members have an interest in accurate information about Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' abilities to carry out their missions, and Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

20.    One Coastkeeper member regularly walks, hikes, bikes, and enjoys views and wildlife and native plants in and around the Receiving Water downstream from the Facility. She has engaged in these activities in multiple areas including the network of trails along near the mouth of the Sweetwater River, the San Diego Bay National Wildlife Refuge, the Living Coast Discovery Center, Chula Vista Bayside Park, and the bikeway along the Sweetwater River between San Diego Bay and the Plaza Bonita mall. She began regularly recreating in these areas in about 2018 and currently uses and enjoys these areas almost every week. She participated in the Bike the Bay event each year it has run since 2019. She participated in the biking and running segments of the Chula Vista Triathlon, but did not partake in the swim segment, due in part to her concerns about water quality and pollution in South San Diego Bay. This member is aware of, and concerned about, the many pollutant impairments and pollution burdens in the Sweetwater River and San Diego Bay. She is also aware of the Facility's pollutant

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    4

discharges, which contribute to this pollution burden. At times she can smell odors from the waters, and she is concerned about the health of the wildlife, habitat, and ecology in these areas, all of which negatively impact her use and enjoyment. She also avoids contact water recreation such as kayaking due to these same concerns.

21.    Another Coastkeeper member regularly collects water quality samples as part of her employment at multiple locations across the region, including at the mouth of the Sweetwater River, directly in front of Pepper Park. In her previous employment as a research associate, she spent eight field seasons collecting an annual sediment sample in the Sweetwater River, at the intersection of the river and Willow Street. These samples would be analyzed for toxicity parameters including heavy metals such as those discharged by the Facility. She enjoys viewing the National Wildlife Refuge, and cares about the health of the Refuge and its resident flora and fauna. She is aware of, and concerned about, the many pollutant impairments and pollution burdens in the Sweetwater River and San Diego Bay. In light of her education and experience, she has a deep understanding of the impacts of toxicity pollution, and is highly concerned about the health of the Sweetwater River and National Wildlife Refuge. She is also aware of the Facility's pollutant discharges, which contribute to this pollution burden. She wears personal protective equipment when sampling and avoids contact with this water she knows to be polluted. She would like to engage in contact recreation at the mouth of the Sweetwater River but avoids such activities due to her concerns about pollutant levels.

22.    A CERF member lives in Chula Vista and regularly recreates near Sweetwater River. This member routinely takes her child to Rohr Park, adjacent to Sweetwater River and downstream of the Facility and its discharges. She has a deep appreciation for the birds, fish, and wildlife that depend on Sweetwater River and enjoys watching its resident flora and fauna. She would like to engage in greater contact recreation in and around Sweetwater River but avoids such activities due to her concerns about pollutant levels. She also discourages her minor child from engaging in such activities because of such concerns.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    5

23. Plaintiffs and Plaintiffs' members have an interest in accurate information about Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' abilities to carry out their missions, and Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

24. Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' and their members' use and enjoyment of those waters.

25. The violations of the IGP and CWA at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs and their members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

26. The relief sought herein will redress the harms to Plaintiffs and their members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

27. An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

28. The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

29. Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

30. The "discharge of a pollutant" means, among other things, "any addition of

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    6

any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

31. "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

32. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

33. The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

34. The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)−(iii).

35. Private citizens may sue under the Clean Water Act to enforce the specific provisions of California's Industrial General Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th Cir.1998).

**B.     California's IGP.**

36. Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

37. California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

38.     The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

39.     On July 1, 2015, the current IGP became effective pursuant to *Order No. 2014-0057-DWQ.*

40.     On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018*, the reissued  IGP took effect.

41.     In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

42.     Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC code 3273 require coverage by the Permit. *Id*., Attachment A.

43.     Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.      The IGP Discharge Prohibitions.**

44.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this [Industrial] General Permit or another NPDES permit." *Id*. § III.A.

45.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

46.     These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

47.     The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality

control plans and policies. *Id.* § III.D.

48. The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

49. Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Permit Discharge Prohibition III.D.

**D.     The IGP Effluent Limitations.**

50. The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. Permit § V.A.

51. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

52. Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Permit § V.A.

53. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2021 MSGP went into effect on March 1, 2021. The EPA Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2021 MSGP, 86 Fed. Reg. 10,269 (Feb. 19, 2021); *see also* 2021 MSGP Fact Sheet at 78.

54. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES        9

BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

55. Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); Permit § V.A.

**E.     The IGP Receiving Water Limitations.**

56. The IGP Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. Permit § VI.B.

57. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

58. The IGP Receiving Water Limitations prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

59. Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

60. WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

61. The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

62. The Beneficial Uses for the Spring Valley Creek and the Sweetwater River include municipal and domestic supply; industrial service supply; contact water recreation; non-contact recreation; warm-freshwater habitat; and wildlife habitat. Basin

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     10

Plan, Table 2-2.

63.    The Beneficial Uses for the San Diego Bay include industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; estuarine habitat; migration of aquatic organisms; spawning, reproduction, and/or early development; shellfish harvesting; and rare, threatened, or endangered species. Basin Plan, Table 2-2.

64.    The Beneficial Uses for the Pacific Ocean include industrial service supply; navigation; contact and non-contact recreation; commercial and sports fishing; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; marine habitat; aquaculture; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. Basin Plan, Table 2-3.

65.    Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

66.    According to the current 303(d) List of Impaired Water Bodies, Sweetwater River is impaired for benthic community effects, bifenthrin, chlorpyrifos, indicator bacteria, nitrogen, dissolved oxygen, phosphorus, pyrethroids, total dissolved solids, and toxicity. The San Diego Bay is impaired for mercury, PAHs (polycyclic aromatic hydrocarbons), and PCBs (polychlorinated biphenyls). The Pacific Ocean shoreline near the San Diego Bay is impaired for indicator bacteria. California 2020-2022 Integrated Report.

67.    Polluted discharges from industrial facilities, such as the Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

68.    The following WQSs are established by the Basin Plan for the Spring Valley Creek downstream of the Facility: 0.3 mg/L for iron; 0.1 mg/L for phosphorus; 0.05 mg/L for manganese; and pH "shall not be depressed below 6.5 or raised above 8.5" in

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    11

inland surface waters. Basin Plan at 3-21. The CTR criteria for copper is 0.013 mg/L based off 100 mg/L hardness; and the criteria for zinc is 0.12 mg/L based off 100 mg/L hardness.

69. Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQSs, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* Permit § VI.A.

**F.     The IGP Storm Water Pollution Prevention Plan Requirements.**

70. Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

71. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

72. The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     12

and implementing the SWPPP, and a Monitoring Implementation Plan. *Id*. §§ X.A–I.

73. Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. Permit §§ I.K.69, X.A.9, X.B.1. The IGP requires dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. Permit § X.B.2.

74. The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id*. § XV.

**G.      The IGP Monitoring and Reporting Requirements.**

75. Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id*. §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Permit §§ X.I, X, I.K.69–70.

76. The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Permit Fact Sheet § J at 138.

77. Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. Permit § XI.A.1.

78. A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

79. The Reporting Year is defined as July 1 through June 30. Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id*. § XI.B.2.

80.    Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

81.    Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

82.    Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

83.    Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

84.    Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

85.    Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual Report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

86.    All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id*. § XXI.K.

## V.    FACTUAL BACKGROUND

### A.    Facility Site Information, Industrial Activities, and Pollutant Sources.

87.    The SMARTS database indicates Defendant had been covered under the IGP since at least August 27, 2013 to conduct industrial operations at the Facility, under Waste Discharge Identification ("WDID") Number 9 37I024432.

88.    However, as of September 23, 2025, Defendant improperly obtained a Non-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    14

Exposure Certification ("NEC") under WDID Number 9 37NEC015050, despite making no change to the manner in which it conducts industrial activities outdoors and exposed to stormwater.

89.    The Facility's Standard Industrial Classification ("SIC") code is 3273 (Ready-Mixed Concrete), which requires Permit coverage.

90.    According to the Facility's NOI, the Facility is one and one-half acres, and is eighty percent impervious. The entire site consists of industrial areas exposed to stormwater.

91.    The Facility manufactures and delivers ready mix concrete, aggregate, and colored products. SWPPP at 7. According to the SWPPP and Site Map, the Facility includes two lots, separated by Grand Avenue. The main yard, west of Grand Avenue, includes additional fleet parking areas, several large piles of various aggregate materials, a concrete wash area, load staging area, batch house/power house, cement silo area, storage of used oil, waste loading and storage areas, and an office building and employee parking lot. *See* Site Map.

92.    According to the SWPPP, the smaller lot, east of Grand Avenue, is used for secondary fleet parking. *Id.* However, direct observations, satellite imagery, and review of publicly available information indicate the smaller lot is used for numerous industrial activities, including but not limited to vehicle washing or maintenance, concrete breakdown, or equipment washing.

93.    Direct observations, satellite imagery, and review of publicly available information including County of San Diego and Regional Water Quality Control Board ("Regional Board") inspection records evidence extensive outdoor activities, including the storage of vehicle parts and hazardous materials such as diesel fluid and hydraulic oils.

94.    Despite conducting industrial activities that contribute a variety of pollutants to storm water and non-storm water discharges, the Facility's SWPPP completely lacks a Pollutant Source Assessment and omits any mention of materials or pollutants associated

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    15

with concrete manufacturing and shipping operations, in violation of the Permit.

95.    Although ConMex has never collected its own storm water samples as required by the Permit, samples of the Facility's discharge obtained by Coastkeeper on March 6, 2025 from the east lot driveway reflected high concentrations of (1) metals such as manganese, aluminum, copper, iron, and zinc, (2) total suspended solids ("TSS"), (3) nutrients such as phosphorus, nitrate + nitrite ("N+N"), and total nitrogen, and (4) oil and grease ("O&G") in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment. Ex. 1, Summary of Coastkeeper's Storm Water Sampling Data.

96.    The U.S. EPA Industrial Stormwater Fact Sheet for Sector E further indicates that pollutants associated with the Facility's industrial activities and materials related to concrete production include TSS, pH, COD, lead, iron, zinc, biological oxygen demand ("BOD"), aluminum, arsenic, cadmium, chromium, benzene, and O&G. *Available at*, https://www.epa.gov/sites/default/files/2015-10/documents/sector_e_glass.pdf.

97.    Additionally, it is well known that cement dust and fly ash are harmful, toxic, and carcinogenic. Fly ash can contain lead, arsenic, mercury, and cadmium. *See, e.g.,* Physicians for Social Responsibility, *Coal Ash: Hazardous to Human Health*, available at https://www.psr.org/wp-content/uploads/2018/05/coal-ash-hazardous-to-human-health.pdf. Cement dust in the United States commonly contains mercury, copper, chromium, hexavalent cadmium, nickel, manganese, lead, and iron. *See, e.g.,* Ogunbileje J.O., Sadagoparamanujam V.M., Anetor J.I., Farombi E.O., Akinosun O.M., Okorodudu A.O, *Lead, mercury, cadmium, chromium, nickel, copper, zinc, calcium, iron, manganese and chromium (VI) levels in Nigeria and United States of America cement dust.* CHEMOSPHERE, (Dec. 21, 2012), available at https://www.ncbi.nlm.nih.gov/pubmed/23261125.

98.    Storm water discharges from the Facility enter the County of San Diego storm sewer system ("MS4"), and thereafter flow into the Spring Valley Creek, the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    16

Sweetwater Reservoir, the Lower Sweetwater River, the San Diego Bay, and the Pacific Ocean.

99.    Industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

100.    Many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

101.    Pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

102.    One or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

103.    Even if regulated industrial activities are not conducted at all locations throughout the entire Facility, the Facility lacks BMPs or other controls that would adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

104.    Due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

105.    Industrial activities at the Facility generate significant amounts of numerous

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    17

pollutants. During rain events, these pollutants are washed off surfaces throughout the Facility, discharged from the Facility, and eventually flow to Receiving Waters.

106.   The Facility's site map fails to accurately note the directions of storm water flow, on-site storm water retention systems, identify discharge locations, or delineate grade breaks and drainage areas. However, based on information in the SWPPP and visual observations, all runoff at the Facility flows to the southwest corner of the Facility, where it is either retained or discharges into the County of San Diego's MS4 system. *See* Ex. 1.

**B.      The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

107.   With every significant rain event, the Facility discharges polluted storm water into the Receiving Waters.

108.   The Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

109.   Storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions and Effluent Limitations of the IGP.

**1. Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

110.   The Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* Permit § III.C.

111.   The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

112.   "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES      18

113.  Coastkeeper's sampling data show discharges with high concentrations of (1) metals such as manganese, aluminum, copper, iron, and zinc, (2) total suspended solids ("TSS"), (3) nutrients such as phosphorus, nitrate + nitrite ("N+N"), and total nitrogen, and (4) oil and grease ("O&G") in excess of various water quality objectives, benchmarks, and other standards that were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. Such discharges of polluted storm water violate the Permit. *See* Ex. 1. These polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

114.  Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR. For example, Coastkeeper's monitoring data of the Facility's discharge on March 6, 2025 shows numerous instances of high concentrations of (1) metals such as copper, iron, manganese, and zinc, and (2) nutrients such as phosphorus and total nitrogen in excess of respective Basin Plan Water Quality Objectives and the CTR. *See* Ex. 1, Summary of Coastkeeper's Storm Water Sampling Data.

115.  Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

116.  "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

117.  Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2020 IGP.

118.  Information available to Plaintiffs, including its review of publicly available

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    19

information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

119. Thus, Coastkeeper's monitoring data demonstrates the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

120. Upon information and belief, including the likelihood of the presence of many additional pollutants described in Section V.A, *supra*, the Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

121. Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.C and III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

122. These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

123. The Facility has been in violation of these Discharge Prohibitions since at least September 8, 2020 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time. *See* Ex. 1 (setting forth dates of all precipitation events during the past five years).

**2. Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.**

124. Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* Permit § V.A.

125. Coastkeeper's storm water monitoring data indicates that the Facility's storm water discharges exceed the EPA Benchmarks or Annual NALs for iron, aluminum, copper, zinc, phosphorus, N+N, and TSS. *See* Ex. 1. For example, on March 6, 2025, the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    20

Facility's discharge contained TSS levels of 1,700 mg/L, which is seventeen times higher than the EPA benchmark of 100 mg/L. *Id.*

126. The March 6, 2025 sample of the Facility's discharge also contained concentrations of aluminum at 22 mg/L, over twenty times higher than the EPA benchmark of 1.1 mg/L.

127. As discharges containing pollutant concentrations that exceed EPA Benchmarks indicate the Facility has not developed and/or implemented BMPs that meet BAT/BCT requirements, the sampling data collected strongly indicates the Facility has failed and continues to fail to develop and/or implement BMPs that comply with the BAT/BCT requirements.

128. Further, visual observations and photographs of the Facility from January 27, February 13, and March 6, 2025, confirm that it lacks BMPs that would achieve BAT/BCT. As indicated in Exhibit 1, these observations, during dry and wet weather events, show extensive fine sediment and concrete batching fines littered throughout the Facility, multiple unconfined material stockpiles, waste concrete caked onto trucks and on the ground during wet weather, and consistent trackout of cement fines, dust, and aggregate particles from both the east and west Facility driveways, demonstrating a complete lack of material management and/or sweeping protocols.

129. Coastkeeper representatives also observed multiple erosion rills and flow pathways along the sloped southern border of the Facility's main yard, as well as extensive amounts of accumulated, gray-colored sediment and concrete fines spilling onto the sidewalk and into the street, curb gutters, and eventually into the County of San Diego's MS4 system and downstream Receiving Waters. *Id.*

130. Direct observations, photographs, and Regional Board inspection records also indicate that numerous industrial materials are routinely left uncovered outside, in the rain, including greasy and rusting vehicle parts, partially dismantled vehicles, open containers of liquids such as diesel exhaust fluid and hydraulic oil, and scattered trash. *Id.*

131. This complete failure to implement good housekeeping BMPs violates the

BAT/BCT requirements of the Permit. Thus, the Defendant has failed to develop and implement BMPs that meet BAT/BCT requirements, in violation of the Industrial General Permit.

132. Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

133. These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

134. The Facility has been in violation of these Effluent Limitations since at least September 8, 2020 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**C.      Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.**

135. The Facility has violated and continues to violate IGP Receiving Water Limitations.

136. The Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

137. Coastkeeper's storm water sampling data demonstrates the Facility has discharged (1) metals such as copper, iron, manganese, and zinc, (2) nutrients such as nitrogen and phosphorus, and (3) suspended solids in excess of respective Basin Plan Water Quality Objectives and/or CTR. *See* Ex. 1. Because the Facility has never collected its own storm water samples, its potential discharge of these parameters at levels above the Basin Plan and/or CTR has likely gone unreported for years.

138. Sweetwater River is impaired for nitrogen and phosphorus. Storm water samples collected from the Facility on March 6, 2025 show concentrations of nitrogen at 7.2 mg/L, over the Basin Plan objective of 1 mg/L, and concentrations of phosphorus at 2.2 mg/L, twenty-two times higher than the Basin Plan objective of 0.1 mg/L. *See* Ex. 1.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    22

139. The Sweetwater River is impaired for low dissolved oxygen. Excess concentrations of nutrients such as nitrogen and phosphorus can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins can move up the food chain. U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment (last updated Apr. 15, 2019). High nutrient loading also results in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes. As such, the Facility's polluted discharges cause and/or contribute to Sweetwater River's dissolved oxygen, nitrogen, and phosphorus impairments. *See* Ex. 1.

140. The Sweetwater River is impaired for toxicity. Zinc and copper are highly toxic pollutants in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. § 131.38. The Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairments of the Sweetwater River.

141. The Sweetwater River is impaired for total dissolved solids ("TDS"). Dissolved solids in natural waters may consist of carbonates, bicarbonates, chlorides, sulfates, phosphates, nitrates, magnesium, sodium, iron, manganese and other substances." Basin Plan at 3-32. Coastkeeper's March 6, 2025 sample collected from the Facility contained concentrations of iron at 26 mg/L, over eighty-six times higher than the Basin Plan objective of 0.3 mg/L. *See* Ex. 1. Therefore, the Facility's discharges of high concentrations of iron, manganese, nitrogen, and phosphorus cause and/or contribute to the Sweetwater River's TDS impairment.

142. The Sweetwater River is impaired for benthic community effects. The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses. Basin Plan at 3-32. "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    23

interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id.* at 3-31. As such, the Facility's discharges of high levels of TSS cause and/or contribute to the Sweetwater River's benthic community effects impairment.

143. The Basin Plan and CTR are applicable WQSs under the IGP.

144. Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. Permit § VI.A.

145. Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the IGP Receiving Water Limitations. *See* Permit § VI.B.

146. Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

147. The Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

148. The Facility has been in violation since September 8, 2020 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.     Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

149. Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

150. Generally, the SWPPP lacks required sections and an adequate analysis of the industrial processes, associated pollutants, and BMPs. *See generally* Permit § X.

151. The SWPPP fails to provide a comprehensive list of industrial processes and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     24

the narrative descriptions for these processes, both of which violate the Permit. Permit § X.G.1. For example, the SWPPP lists or alludes to the following processes: material and general waste storage, washout activities, finished product and equipment storage, and loading/unloading of trucks. *See* Ex. 1. However, the SWPPP fails to elaborate what exactly these activities entail, and where on site these activities occur. For industrial machinery and use, the SWPPP omits any required narrative description. Thus, the SWPPP fails to provide all required elements describing its industrial processes, in violation of the Permit. Permit § X.G.1.

152.   The SWPPP omits a list of industrial materials, including approximate quantities, physical characteristics, and storage locations, in violation of the Permit. Permit § X.G.2.

153.   The SWPPP fails to adequately analyze all pollutants associated with the industrial activities and processes, in violation of the Permit. Permit § X.G.2. Beyond the generic pollutants listed in the sampling plan, the SWPPP fails to identify any pollutants that may be present onsite, including many of the pollutants present in Coastkeeper's March 6, 2025 storm water samples of the Facility's discharge. *See* Ex. 1.

154.   Because the Facility fails to list all the industrial activities and associated pollutants, the SWPPP likewise fails to identify and implement BMPs to reduce exposure of pollutants associated with such activities. Permit § X.H. The SWPPP must (1) identify what BMPs are being implemented to prevent specific pollutant sources from entering storm water, (2) identify the pollutant this is intended to prevent (like metal particulates), (3) describe the frequency, location, and duration of these BMPs, (4) the individual responsible for implementation and procedures, (5) the equipment necessary, and (6) the visual observations' schedule in place to continue to monitor BMP effectiveness. Permit § X.H.4. However, the SWPPP fails to include a BMP Summary Table, let alone a single mention of site-specific BMPs, in violation of the Permit. Permit § X.H.5.

155.   The SWPPP also fails to identify the Sweetwater River as the Receiving Water. As such, it fails to adequately analyze the pollutants for which the Sweetwater

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    25

River is impaired. *See* Ex. 1.

156.   The SWPPP fails to adequately (1) describe dust and particulate generating activities; and (2) to assess potential pollutant sources by, at a minimum, including (i) the areas of the facility with likely source of pollutants in industrial storm water discharges and authorized NSWDs; (ii) the pollutants likely to be present in industrial storm water discharges and authorized NSWDs; (iii) the approximate quantity, physical characteristics (e.g., liquid, powder, solid, etc.), and locations of each industrial material handled, produced, stored, recycled, or disposed; (iv) the degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water; (v) the direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs; (vii) the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs; and (viii) the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs. Permit § X.G.1.c.

157.   The Facility site map is also defective, missing many components like storm water drainage areas, locations of structural controls, where materials are exposed to storm water, storage tanks, and shipping and receiving areas. Permit § X.E.3. Indeed, the site map omits basic elements like a legend or north arrow. Notably, the site map erroneously indicates that the Facility discharges storm water in two locations. As detailed in Exhibit 1, the Facility discharges from multiple locations not identified in the SWPPP or site map.

158.   Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act. Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least September 8, 2020.

159.   Therefore, ConMex has also failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants

to storm water and the subsequent discharge of pollutants from the Facility, in violation of the Permit. CERF and Coastkeeper's direct observations, and publicly available photos, strongly evidence that the Facility has failed, and continues to fail to implement even minimum BMPs.

160.    These violations are ongoing and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**E.    Defendant Has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan at the Facility.**

161.    Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

162.    The Facility Owners and/or Operators have failed and continue to fail to develop and/or implement a MIP that provides for the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of Permit. Permit § XI.B.4. While Section XI.C.4 of the Permit allows permittees to reduce the number of locations to be sampled, there is no indication the Facility Owners and/or Operators have complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility. As detailed in Exhibit 1, the SWPPP fails to properly identify sampling locations. Further, the site map erroneously identifies two discharge locations at the Facility, despite the fact that storm water and non-stormwater are discharged from multiple non-designated discharge points, including the east lot's driveway, and at multiple points along the main lot's southern perimeter.

163.    The Facility Owners and/or Operators have failed and continue to fail to sample and analyze storm water discharges for all parameters required by the Permit. Coastkeeper's storm water sampling found high concentrations of (1) metals such as manganese, aluminum, copper, iron, and zinc, (2) total suspended solids ("TSS"), (3) nutrients such as phosphorus, nitrate + nitrite ("N+N"), and total nitrogen, and (4) oil and grease ("O&G"). These pollutants are directly associated with the Facility's many outdoor industrial activities. Facilities with the SIC code 32XX, like ConMex, are

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    27

required to sample for iron in addition to the parameters required by all facilities (TSS, oil and grease, and pH). In addition to these minimum requirements, the Facility must also sample and analyze parameters specific to the industrial pollutants onsite. However, because the SWPPP and pollutant source assessment are deficient, ConMex fails to include numerous pollutants associated with the Facility's industrial activities and materials in its MIP. ConMex's failure to include these parameters in the Facility's MIP is an ongoing violation of the Permit.

164. The Facility Owners and/or Operators have also failed and continue to fail to collect the required number of storm water samples for each reporting period. The Permit requires facilities in a compliance group to collect two samples each reporting period. However, the Facility has not collected a single storm water sample since at least 2020. *See* Ex. 1, Table 1. The Facility Owners and/or Operators' failure to collect the required number of storm water samples during each reporting period has violated and continues to violate the Permit.

165. The Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. On information and belief, including the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

166. Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

167. Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least September 8, 2020.

168. These violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least September 8, 2020.

/ / /

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    28

**F.      Defendant Has Violated the IGP's Reporting Requirements.**

169.   Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

170.   In each Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this Industrial General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both." Permit § XXI.N.

171.   The Facility Owners and/or Operators have continuously failed to meet the Permit's reporting requirements. The Facility's only complete Annual Report uploaded to SMARTS is from the 2015-2016 Reporting Year. The following year, the Facility's Legally Responsible Person (LRP) received a courtesy notice from the San Diego Regional Water Board for the Facility's failure to submit the required Ad Hoc and Annual Reports for the 2016-2017 reporting year.

172.   The Facility did upload documents labeled "Annual Reports" for the 2017 and 2018 reporting years. Nonetheless, the documents uploaded are not Annual Reports – they are one-page documents with basic permittee information, such as WDID and contact information. Thus, the Facility's LRP knew or should have known the Facility failed to comply with the Permit's reporting requirements, as well as numerous other procedural and substantive provisions of the Permit.

173.   Every day Defendant conducts operations at the Facility without reporting as required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    29

174. Defendant has been in daily and continuous violation of the IGP's reporting requirements every day since at least September 8, 2020.

175. These violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since September 8, 2020.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

176. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

177. Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

178. Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

179. Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from at least September 8, 2020 to the present. Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

180. Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from September 8, 2020 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

/././

/././

/././

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

181.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

182.   Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

183.   Discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

184.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* Permit § V.A; *see also* 33 U.S.C. § 1311(b).

185.   Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

186.   Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from at least September 8, 2020 to the present. Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

187.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

188.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     31

By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since September 8, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

189.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

190.   The Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

191.   Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

192.   Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

193.   Discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

194.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. Permit §§ VI.A–B; 33 U.S.C. § 1311(b).

195.   Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

196.   Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from September 8, 2020 to the present. Defendant's violations of

the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

197. Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

198. Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

199. Defendant has been in violation of the IGP Receiving Water Limitations every day since September 8, 2020. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since September 8, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

200. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

201. Defendant has failed and continues to fail to develop and/or implement an adequate SWPPP for the Facility.

202. Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

203. Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* Permit § X; *see also* 33 U.S.C. § 1311(b).

204. Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from at least September 8, 2020, to the present. Defendant's violations

of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

205.    Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

206.    Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since September 8, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

207.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

208.    Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

209.    Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* Permit § XI; *see also* 33 U.S.C. § 1311(b).

210.    Defendant has been in violation of the IGP MIP requirements every day from at least September 8, 2020, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

211.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

212.    Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    34

alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since September 8, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the IGP.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

213.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

214.   Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

215.   Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. Permit §§ XI.B.1–3; 33 U.S.C. § 1311(b).

216.   Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* Permit § XI.B.6; *see also* 33 U.S.C. § 1311(b).

217.   Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since at least September 8, 2020. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

218.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

219.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since September 8, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES      35

## VII.    RELIEF REQUESTED

220.    Plaintiffs respectfully request that this Court grant the following relief:

a.    A court order declaring the Defendant has violated and continues to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.    A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.    A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.    A court order assessing civil monetary penalties for each violation of the CWA at $68,445 per day per violation for violations that occurred after November 2, 2015 and assessed on or after January 8, 2025; 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

e.    A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d)

f.    Any other relief as this Court may deem appropriate.

Dated: June 30, 2026

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    36

SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    37